JS-6

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

JESSICA LEE DAVIS,

Plaintiff,

v.

TRANS UNION, LLC, EQUIFAX INFORMATION SERVICES, LLC, EXPERIAN INFORMATION SOLUTIONS, INC., THE PNC FINANCIAL SERVICES GROUP, INC.,

Defendants.

Case No. 2:22-cv-05819-SPG-AS

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF NOS. 94, 96, 99, 102]**

Before the Court is Defendant PNC Bank, N.A.'s ("PNC") Motion for Summary Judgment, (ECF No. 99 ("Motion" or "MSJ")). Having considered the parties' submissions, oral arguments, the relevant law, and the record in this case, the Court GRANTS, IN PART, and DENIES, IN PART, the Motion.

# I. BACKGROUND[1]

## A. Factual Background

### 1. The Original Loan

On July 15, 2021, Plaintiffs Jessica Lee Davis ("Mrs. Davis") and Corey Dell Davis ("Mr. Davis," and, together with Mrs. Davis, "Plaintiffs") purchased a Ford F-150. (JAF ¶ 1). To finance this purchase, Plaintiffs entered into a Motor Vehicle Retail Installment Sales Contract (the "Contract") with Gullo Cars of Conroe LLP ("Gullo"). (*Id.*). Under the Contract, Plaintiffs agreed to pay $61,426.22 at an annual interest rate of 5.46% over eighty-four months (the "Original Loan"). (*Id.* ¶ 2). Under the Contract, payments would be applied first to outstanding interest, then to any unpaid principal. (*Id.* ¶ 107). If Gullo received a refund on insurance or service contracts included in the vehicle price, Gullo would first subtract those refunds from the outstanding balance, then, once Plaintiffs satisfied "all amounts owed," Gullo would pay any overage to Plaintiffs. (*Id.* ¶ 108). Gullo assigned its interest in the Contract to BBVA USA ("BBVA"). (*Id.* ¶ 4; ECF No. 99-4 at 13 (Ex. 1.1)).

Plaintiffs made an initial $883.50 payment towards the Original Loan on July 27, 2021, (JAF ¶ 70), two months before any payment was due under the Contract, (ECF No. 99-4 at 13 (providing payments were due monthly beginning on August 29, 2021)). Mrs. Davis arranged for these payments to be made automatically through her United

---

[1] The following summarized facts are uncontroverted unless otherwise stated. *See* (ECF No. 99-2 (Joint Appendix of Facts ("JAF"))). When determining a motion for summary judgment, the Court considers only evidence admissible at trial, though the form may differ at the summary judgment stage. *Godinez v. Alta-Dena Certified Dairy LLC*, No. CV 15-01652 RSWL (SSx), 2016 WL 6915509, at *3 (C.D. Cal. Jan. 29, 2016). The Court has reviewed the entire record, including the parties' JAF, objections, and evidence. The Court discusses only the facts that are relevant to its decision. To the extent the Court relies on evidence that is subject to an objection, the Court overrules the objection. To the extent the Court does not rely on evidence objected to by the parties, the objections are overruled as moot.

Services Automobile Association checking account (the "USAA Account"). (JAF ¶ 20). Plaintiffs made an additional automatic payment in the same amount on August 16, 2021. (JAF ¶ 72).

2. Plaintiffs' Efforts to Refinance the Original Loan

On August 20, 2021, Plaintiffs completed an application for a loan funded by USAlliance (the "USAlliance Loan") intended to pay off the Original Loan. (JAF ¶¶ 8, 10, 109). Plaintiffs obtained the USAlliance Loan through Gravity Lending ("Gravity"). (*Id.* ¶ 9). Gravity determined that a payment of $58,694.61 would satisfy the Original Loan. (*Id.* ¶ 13). Although the parties dispute how Gravity arrived at the sum of $58,694.61, as a matter of simple arithmetic, this amount was less than the Original Loan's outstanding principal balance after Plaintiffs' two $883.50 payments.[2]

Meanwhile, BBVA began preparing to merge with and into PNC, including by sharing its records with PNC.[3] (JAF ¶ 5; ECF No. 99-11 at 127). On September 16, 2021, while Plaintiffs' USAlliance Loan application remained pending, Plaintiffs made an additional automatic payment in the amount of $883.50 towards the Original Loan. (JAF ¶¶ 8, 75). Then, on September 27, 2021, Gravity sent BBVA a check in the amount of $58,694.61 (the "Gravity Payment"), which BBVA received on September 28, 2021. (*Id.* ¶¶ 16–17). PNC's records reflect that, unlike with Plaintiffs' earlier payments and contrary

---

[2] Although it is not clear when interest began accruing on the original loan, this ambiguity does not change the fact that Gravity's calculated amount was insufficient to pay off the Original Loan's outstanding principal balance. Assuming, as PNC does, that interest began accruing as soon as BBVA issued the loan on July 15, 2021, Plaintiffs' two payments would have reduced the outstanding principal to approximately $59,950.96. *See* (MSJ at 21 (computing interest and outstanding principal in accordance with Texas Finance Code)). Even if interest did not begin to accrue until August 29, 2021, the first day that the Contract required any payment, Plaintiffs' payments would have reduced the Original Loan's outstanding principal to $59,659.22.

[3] Although PNC's records reflect that PNC prepared a communication to Plaintiffs regarding this merger dated September 13, 2021, Plaintiffs dispute receiving this letter, as well as whether it was ever sent. (JAF ¶ 6). The Court does not believe this dispute is material to the Motion.

to the Contract's terms, BBVA applied the Gravity Payment to the Original Loan's principal balance before satisfying any outstanding interest.[4] (ECF No. 99-4 at 31). On October 8, 2021, PNC imported BBVA's data into its system, creating PNC's records of the Original Loan. (ECF No. 99-11 at 126–27). On October 12, 2021, BBVA completed its merger with PNC. (JAF ¶ 5).

3. Post-Refinancing Transactions

On October 16, 2021, an additional automatic payment in the amount of $759.23 was withdrawn from the USAA Account. (*Id.* ¶ 22). PNC's records reflect that this sum was applied to $650.85 in apparent outstanding principal and $108.19 in purported accrued interest, satisfying in full the amount PNC records indicated Plaintiffs still owed with $0.19 to spare. (*Id.* ¶ 23). Plaintiffs, however, did not recognize this charge and initiated a dispute with USAA, believing the transaction was fraudulent. (*Id.* ¶¶ 124–25). In response, USAA placed a permanent stop on all future payments from Plaintiffs' account to PNC. (*Id.* ¶ 126). Meanwhile, on October 26, 2021, PNC issued a refund of $0.19 to Plaintiffs. (*Id.* ¶ 24). On October 29, 2021, USAA reversed the $759.23 payment. (*Id.* ¶ 27). PNC's records reflect that it received additional monthly payments—all reversed—in the amount of $883.50 from November 2021 through March 2022. (*Id.* ¶ 28).

At some point following Plaintiffs' October 2021 payment PNC initiated a refund of certain unearned premiums. (*Id.* ¶ 25). Under the terms of the contract, Plaintiffs were to receive this refund only after satisfying "all amounts owed." (*Id.* ¶ 108). PNC issued the refund to Plaintiffs on December 14, 2021. (*Id.* ¶ 26).

4. PNC's Credit Reporting

In early 2022, Plaintiffs learned that their credit scores had dropped significantly as a result of derogatory information reported by PNC. (*Id.* ¶ 129). Mrs. Davis repeatedly contacted PNC by telephone to confirm the amount she and her husband purportedly owed.

---

[4] If the Original Loan began accruing interest as soon as it was issued, as of September 28, 2021, the Original Loan would have had an outstanding balance of $59,345.46 in principal and $106.53 in interest accrued since Plaintiffs' last payment on September 16, 2021.

(*Id.* ¶ 136). PNC representatives were unable to give her a consistent answer, at least once even informing Mrs. Davis that the Original Loan was paid off. (*Id.*). *See also* (ECF No. 99-11 at 319 ("rep is looking into so if pay off was what was paid we need to honor from bbv")).

On March 29, 2022, PNC received the first of Mrs. Davis's credit reporting disputes from Experian Information Solutions ("Experian"), which consisted of an Automated Consumer Dispute Verification ("ACDV") form. (JAF ¶¶ 33–34). PNC cannot identify exactly which actions its dispute agents took in response to any of Plaintiffs' ACDV forms, but, if those agents followed PNC policy, they would have reviewed PNC's records to determine whether the Original Loan had been paid in full. (ECF No. 99-11 at 82–95). In response to this dispute, PNC updated certain information to reflect PNC's latest records; PNC did not recognize the Original Loan as paid in full. (JAF ¶ 37). On March 31, 2022, PNC began reporting the Original Loan as charged-off. (*Id.* ¶ 32).

PNC received Mrs. Davis's second credit reporting dispute from Experian on April 18, 2022. (*Id.* ¶ 38). Like her first dispute, it consisted of an ACDV form, which PNC responded to by updating certain information consistent with PNC's records. (*Id.* ¶¶ 39–42). PNC's exact actions taken in response to this dispute are likewise unknown. (ECF No. 99-11 at 82–95). Equifax Information Services, LLC ("Equifax") and Experian sent PNC Mrs. Davis's third and fourth disputes on April 20, 2022. (JAF ¶¶ 43, 48). Both disputes consisted of an ACDV form as well as certain accompanying documents. (*Id.* ¶¶ 44, 49). PNC again, after undertaking some form of investigation, updated certain information consistent with PNC's records and continued not to identify the Original Loan as paid off. (*Id.* ¶¶ 47, 52). PNC received Mrs. Davis's fifth and final credit reporting dispute from Trans Union, LLC ("Trans Union") on April 22, 2022. (*Id.* ¶ 53). This dispute, too, consisted of an ACDV form with accompanying documents. (*Id.* ¶ 54). PNC's response to this dispute was identical to its approach to Mrs. Davis's four prior disputes. (*Id.* ¶ 57).

On August 4, 2022, PNC received two additional credit reporting disputes relating to the Original Loan, this time from Trans Union and Equifax on behalf of Mr. Davis. (*Id.* ¶¶ 58, 63). The disputes consisted of ACDV forms as well as certain accompanying documents. (*Id.* ¶ 59, 64). PNC's response to Mr. Davis's disputes was identical to its response to Mrs. Davis's disputes. (*Id.* ¶¶ 62, 67).

**B. Procedural History**

Mrs. Davis initiated this action on August 17, 2022. (ECF No. 1 ("J. Davis Compl."). On October 21, 2022, PNC answered Mrs. Davis's complaint and asserted a counterclaim against her for breach of contract, which Mrs. Davis answered on November 11, 2022. (ECF Nos. 39, 40). On November 8, 2022, Plaintiffs paid $775.48 to PNC "under protest." (JAF ¶¶ 100–01). Mr. Davis filed a separate complaint on January 17, 2023.[5] PNC answered Mr. Davis's complaint on February 24, 2023, and, as it did with Mrs. Davis, counterclaimed for breach of contract.[6] Mr. Davis filed his sur-reply to PNC's counterclaim on March 17, 2023.[7] The Court consolidated Plaintiffs' actions on the request of multiple defendants, including PNC, on August 14, 2023. (ECF No. 84). Although Plaintiffs each originally sued Trans Union, Experian, and Equifax in addition to PNC, those three credit reporting entities are no longer parties to this action, leaving PNC as the sole remaining defendant. (ECF Nos. 50, 89, 92).[8]

On January 5, 2024, PNC filed this Motion, seeking summary judgment on Plaintiffs' claims against it and PNC's counterclaims against Plaintiffs. (MSJ). Plaintiffs oppose. (*Id.*). PNC filed a reply brief in further support of its Motion on January 12, 2024.

---

[5] Complaint, Davis v. Trans Union LLC et al., No. 2:23-cv-00334-SPG-AS (C.D. Cal. Jan. 1, 2023), ECF No. 1 ("C. Davis Compl.").

[6] Answer to Plaintiff's Complaint and Counterclaim, Davis v. Trans Union LLC et al., No. 2:23-cv-00334-SPG-AS (C.D. Cal. Feb. 24, 2023), ECF No. 31 ("C. Davis Counterclaim").

[7] Reply to Counterclaims, Davis v. Trans Union LLC et al., No. 2:23-cv-00334-SPG-AS (C.D. Cal. Mar. 17, 2023), ECF No. 41 ("C. Davis Sur-Reply").

[8] *See also* Order, Davis v. Trans Union LLC et al., No. 2:23-cv-00334-SPG-AS (C.D. Cal. June 2, 2023), ECF No. 60.

(ECF No. 101 ("Reply")). Both parties filed various associated sealing applications. (ECF Nos. 94, 96, 102).[9]

## II. LEGAL STANDARD

Summary judgment is appropriate where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing the absence of any genuine issues of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007).

To meet its burden, "[t]he moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). Once the moving party

---

[9] The Court concludes that compelling reasons exist to grant the parties' sealing applications. The two exhibits Plaintiffs seek to seal contain their highly personal and confidential credit history information and, if not sealed, could easily "become a vehicle for improper purposes." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978). *See, e.g.*, *Ramirez v. Trans Union, LLC*, No. 12-cv-00632-JSC, 2014 WL 1995548, at *3 (N.D. Cal. May 15, 2014) (granting request to seal credit report "contain[ing] sensitive financial and personal information about Plaintiff"). The exhibit PNC seeks to seal is a document PNC has access to only by a commercial license with a third party. (ECF No. 102 at 6–7). Given the potential commercial harm that could result to this third party if this document was publicly available, the Court concludes that sealing is appropriate here. *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (holding sealing appropriate to prevent the "release [of] trade secrets").

satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that generic disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). Instead, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted). No genuine issue for trial exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.*

## III. DISCUSSION

PNC moves for summary judgment on Plaintiffs' Fair Credit Reporting Act claims, Mr. Davis's Fair Debt Collection Practices Act ("FDCPA") claim, and Mr. Davis's Rosenthal Fair Debt Collections Practices Act claim. (MSJ at 2–3). PNC also moves for summary judgment on its counterclaims against Plaintiffs for breach of contract. (*Id.* at 3). Mr. Davis has stipulated to the dismissal of his FDCPA claim. (*Id.* at 50). The Court accordingly GRANTS PNC's motion for summary judgment on Count VI of Mr. Davis's Complaint and examines each of the remaining claims in dispute.

### A. Plaintiffs' Theories of Liability and Defenses

As an initial matter, the Court must determine whether Plaintiffs may properly pursue the three theories of liability advanced for the first time in their opposition briefing: (1) that PNC's reporting created the "false impression" that Plaintiffs were financially irresponsible; (2) that PNC's omission of its (and BBVA's) role in causing any outstanding balance on the Original Loan was materially misleading; and (3) that PNC's failure to report the Original Loan as disputed rendered its reporting inaccurate. (*Id.* at 31–32). The Court must also determine whether Plaintiffs may assert the defense of excuse to PNC's counterclaim for breach of contract. (*Id.* at 52–53). As PNC notes in its Reply, Plaintiffs did not plead these theories of liability in their complaints, nor did Plaintiffs assert any affirmative defenses in their sur-replies to PNC's counterclaims. (Reply at 2, 11).

"An addition of new issues during the pendency of a summary judgment motion can be treated as a motion for leave to amend the complaint." *Kaplan v. Rose*, 49 F.3d

1363, 1370 (9th Cir. 1994), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). When considering whether to grant leave to amend, district courts are to balance "the strong policy in favor of allowing amendment" with "four factors: bad faith, undue delay, prejudice to the opposing party, and the futility of amendment." *Id.* Generally, Ninth Circuit precedent "disallows the assertion of new claims after the close of discovery where such claims would place the defendant under different burdens and call for different defenses." *Grayum v. Greene*, 203 F. App'x 103, 104–05 (9th Cir. 2006). *See also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) (barring plaintiffs from advancing new theory of liability where "lack of notice on this issue central to the cause of action makes it difficult, if not impossible, for [defendant] to know how to defend itself").

Here, Plaintiffs gave no prior indication to this Court or to PNC that they sought to rely on new theories of and defenses to liability. The deadline to move to amend the pleadings—February 8, 2023—has long since passed. (ECF No. 45-1). Neither Mrs. nor Mr. Davis ever sought leave to amend their complaints or sur-replies, not after the Court consolidated their motions nor as part of their opposition to PNC's Motion for Summary Judgment. Fact discovery in this action closed on October 20, 2023, and expert discovery closed on December 8, 2023. (ECF No. 78). As a result, to allow Plaintiffs to now advance these new theories of liability or defenses would prejudice PNC. In their respective complaints, Plaintiffs each contended that PNC's reporting was patently inaccurate, a theory of liability predicated on Plaintiffs having in fact paid the Original Loan in full. *See, e.g.*, (J. Davis Compl. ¶¶ 14, 77, 96; C. Davis Compl. ¶¶ 15, 63, 113). Plaintiffs' new legal theories sound in equity, with principles of estoppel or reliance justifying any nonpayment. Although these theories are plausible on the facts of the case, Plaintiffs' belated disclosure has deprived PNC of the opportunity to test these claims and defenses through discovery and motion practice. The issue of whether the Original Loan might, in equity, be satisfied bears on every cause of action at issue in this case—the validity of the information PNC furnished to credit reporting agencies, PNC's efforts to collect the alleged remaining

balance, and PNC's counterclaim for breach of contract. But this theory "requires that the defendant develop entirely different defenses" that are not "necessary to defend" against a claim sounding in patent inaccuracy. *Coleman*, 232 F.3d at 1292. Because imposing "different burdens and defenses" would unfairly prejudice PNC at this stage of the litigation, the Court will consider only the theories put forward in Plaintiffs' complaints. *Id.*

### B. Plaintiffs' Fair Credit Reporting Act Claims

PNC moves for summary judgment on each of Plaintiffs' fifth causes of actions, which seek relief for alleged violations of the Fair Credit Reporting Act ("FCRA"). "Congress enacted FCRA to ensure accurate reporting about the 'credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.'" *Gross v. CitiMortgage, Inc.*, 33 F.4th 1246, 1250 (9th Cir. 2022) (quoting 15 U.S.C. § 1681(a)(2)). Under the FCRA, consumers have a right to request a copy of their credit report from credit reporting agencies. *Id.* at 1251; 15 U.S.C. § 1681g(a). In the event the consumer believes the credit report contains inaccurate information, they may "file a dispute with the credit reporting agency, which in turn notifies the entities that 'furnished' information about the consumer's debt." *Gross*, 33 F.4th at 1251 (citing 15 U.S.C. § 1681i(a)). After receiving a notice of a dispute from a credit reporting agency, furnishers "must correct or delete inaccurate information after conducting an 'investigation with respect to the disputed information.'" *Id.* (quoting 15 U.S.C. § 1681s-2(b)). Furnishers' investigations must, at minimum, be "reasonable" and "non-cursory." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009). A furnisher that willfully or negligently violates its obligations under FCRA Section 1681s-2(b) is subject to civil liability. 15 U.S.C. §§ 1681n, 1681o. *See Gross*, 33 F.4th at 1251.

To prevail on their FCRA claims, Plaintiffs must prove that (1) PNC is a 'furnisher'; (2) Plaintiffs notified the relevant credit reporting agencies that Plaintiffs disputed PNC's reporting as inaccurate; (3) the credit reporting agencies notified PNC of the information in dispute; (4) PNC's reporting was in fact inaccurate; and (5) Defendant failed to conduct

a reasonable investigation as required by Section 1681s-2(b)(1). *Miller v. Westlake Servs. LLC*, 637 F. Supp. 3d 836, 848 (C.D. Cal. 2022). PNC disputes only the fourth and fifth elements. Because the Court agrees that there is no material dispute as to whether PNC's reporting was patently inaccurate, it does not reach whether PNC's investigation was reasonable.

1. Accuracy of PNC's Reporting

PNC's Motion—and, indeed, this entire lawsuit—turns on whether PNC's persistent, continued reporting that Plaintiffs owed between $650.85 and $775.48 on the Original Loan was, in fact, correct, or if the Gravity Payment discharged the Original Loan. Reporting may be "incomplete or inaccurate" within the meaning of the FCRA "because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2010) (citation omitted). Although Plaintiffs now also contend that PNC's reporting was misleading and advance a new basis for finding it patently inaccurate, (MSJ at 29–48), the Court will consider only the basis for liability alleged in Plaintiffs' complaints: that PNC's reporting was patently inaccurate because Plaintiffs paid the Original Loan in full when they refinanced it. *See* above, Section III.A.

In support of its Motion, PNC asserts that, as a matter of law, Plaintiffs cannot establish that PNC's reporting was inaccurate. (MSJ at 23). PNC contends that this is so because "there is no merit to Plaintiffs' theory that they paid the PNC Loan in full." (*Id.*). PNC sets out a series of calculations in accordance with the Texas Finance Code in support of its contention that, as of the time BBVA received the Gravity Payment, the total amount due on the Original Loan exceeded the Gravity Payment. (MSJ at 21–22). As to application of the Gravity Payment itself, PNC does not provide a calculation but simply summarizes its own internal records, which indicate that BBVA applied the Gravity Payment solely to the Original Loan's outstanding principal balance. (*Id.* at 22). Although BBVA did not comply with the Contract's provision that any payment would be first

applied to outstanding interest, this apparent clerical error does not change the fact that the total balance owed on the Original Loan exceeded the Gravity Payment.

In opposition, Plaintiffs argue that "inexplicable discrepancies in PNC's accounting and credit reporting" create a triable issue of fact. (*Id.* at 37). As relevant to the outstanding balance remaining after the Gravity Payment, Plaintiffs focus on a retroactive entry in PNC's records dated October 8, 2021, the day PNC imported BBVA's records into its database. (*Id.* at 38–39). Plaintiffs argue that this entry may have "had the practical effect of retroactively increasing the principal balance by $650.85," and that, before this entry, "BBVA's records . . . would have reflected a balance of $0.00." (*Id.* at 38). But Plaintiffs' speculation about the October 8, 2021, entry ignores the fact that a simple calculation explains the $650.85 remaining principal balance: subtracting the $58,694.61 Gravity Payment from an outstanding principal balance of $59,345.46 leaves a remaining balance of $650.85. Although Plaintiffs dispute PNC's calculations, contending that "Plaintiffs lack information or knowledge sufficient to dispute this statement," (JAF ¶¶ 71, 73, 76), Plaintiffs do not dispute that the Contract provided for any payment to be applied first to outstanding interest, (JAF ¶ 107), and PNC's calculations comport with the method chosen by the Contract, *see* Tex. Fin. Code § 342.002.

Because there is no genuine issue as to whether Plaintiffs' attempted refinancing paid off the Original Loan in full, the Court GRANTS PNC's motion for summary judgment as to Plaintiffs' FCRA claims.

**C. Mr. Davis's Rosenthal Act Claim**

Mr. Davis seeks relief against PNC for purported violations of the Rosenthal Fair Debt Collections Practices Act ("Rosenthal Act"). (C. Davis Compl. ¶¶ 177–78). The California legislature enacted the Rosenthal Act to, among other aims, "prohibit debt collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts." Cal. Civ. Code § 1788.1(b). The Rosenthal Act applies more broadly than the federal Fair Debt Collection Practices Act, imposing liability on "any person who, in the ordinary course of business, regularly, on behalf of that person or others, engages in

debt collection," including creditors collecting their own debts. Cal. Civ. Code § 1788.2(b). Mr. Davis contends that PNC violated Rosenthal Act Section 1788.17, which requires debt collectors to comply with Sections 1692b to 1692j of the Fair Debt Collection Practices Act. Cal. Civ. Code § 1788.17. Mr. Davis specifically alleges that PNC failed to comply with 15 U.S.C. §§ 1692e(2), 1692e(8), 1692e(10), and 1692f. (C. Davis Compl. ¶ 178). PNC concedes that it may be a 'debt collector' within the meaning of the Rosenthal Act, but again contends that it cannot be held liable because Plaintiffs did not successfully discharge their loan during the refinancing process. (MSJ at 50–51).

Section 1692e(2) prohibits certain false representations about consumer debts; Section 1692e(8) prohibits the communication of "credit information which is known or which should be known to be false"; and Section 1692e(10) prohibits (as relevant here) "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt." 15 U.S.C. § 1692e. Section 1692f imposes liability where a debt collection uses "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. As with his claim for violations of the FCRA, Mr. Davis's Rosenthal Act allegations in his Complaint rest on the basis that Plaintiffs had fully satisfied their obligations to PNC vis a vis the Original Loan. Because PNC has set forth evidence conclusively demonstrating that this is not true—and because Plaintiffs have failed to rebut this evidence by raising a genuine issue of fact—Mr. Davis cannot establish the predicate federal law violations required to prevail on his Rosenthal Act claim. Accordingly, the Court GRANTS PNC's motion for summary judgment on this count.

**D. PNC's Counterclaims for Breach of Contract**

Finally, PNC moves for summary judgment against Plaintiffs on its breach of contract counterclaims. (MSJ at 51–52). The Court addresses choice of law before proceeding to the merits of PNC's claim. Although PNC belatedly attempts to invoke the Contract's choice of law clause on reply, (Reply at 4, 11), both parties cited to California law in the Motion, (MSJ at 51–53). Like any contractual right, choice of law clauses may be waived. *See, e.g.*, *Ellison Framing, Inc. v. Zurich Am. Ins. Co.*, 805 F. Supp. 2d 1006,

1011 n.1 (E.D. Cal. 2011). *See also Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). "[C]ontractual waiver generally requires an existing right, a knowledge of its existence, and an actual intention to relinquish it, or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished . . . ." *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1014 (9th Cir. 2023) (internal quotation marks and citation omitted).

Here, in moving for summary judgment on its breach of contract counterclaims, PNC explicitly and repeatedly invoked contract law as determined by "California courts." (MSJ at 51–52). Regardless of whether PNC actually intended to waive the Contract's provision that "Texas law appl[ies] to this contract," (ECF No. 99-4 at 13)—indeed, PNC's invocation of Texas law on reply suggests it did not, *see* (Reply at 11)—this conduct is objectively inconsistent with PNC's intention to enforce the choice of law clause. Indeed, PNC appears to have induced Plaintiffs' reasonable belief that PNC was relinquishing the choice of law clause. *See* (MSJ at 52 ("PNC correctly states the standard for breach of contract under California law . . . ."")). As a result, the Court concludes that PNC has waived its right to invoke Texas law under the contractual choice of law provision.

Under California law, to prevail on its breach of contract counterclaims, PNC must establish "(1) the existence of the contract, (2) [PNC's] performance or excuse for nonperformance, (3) [Plaintiffs'] breach, and (4) the resulting damages to [PNC]." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). Neither party disputes the existence of a valid contract between Plaintiffs and PNC. (JAF ¶¶ 1, 4–5). The parties also agree that PNC's predecessor in interest, Gullo, delivered a Ford F-150 to Plaintiffs. (*Id.* ¶ 1). Although Plaintiffs raise several arguments concerning whether any breach would be excused, the Court need not address these arguments—or PNC's response that Plaintiffs failed to plead any affirmative defenses, *see* (Reply at 11)—because PNC cannot establish damages under California law. The California Civil Code provides that damages for "breach of an obligation to pay money only" are equal to "the amount due by the terms of

the obligation, with interest thereon." Cal. Civ. Code § 3302. Furthermore, where a party "has a fully matured cause of action for money, he must seek damages, and not pursue a declaratory relief claim." *Jolley v. Chase Home Fin., LLC*, 213 Cal. App. 4th 872, 909–10 (2013), *as modified on denial of reh'g* (Mar. 7, 2013).

Here, PNC's counterclaims demanded "$775.48, plus interest and late fees, as well as costs of collection, including, but not limited to, court costs, expenses, and reasonable attorney's fees." (ECF No. 39 at 22), *See also* (C. Davis Counterclaim at 25). In its Motion, PNC for the first time seeks "a judicial declaration that PNC has the exclusive right to the November 2022 Payment" of $755.48. (MSJ at 52). PNC appears to have abandoned its request for attorneys' fees (wisely, given the absence of any contractual support for this claim), as well as any demand for further interest or late fees. (*Id.* ("Plaintiffs owed the remaining sum of $775.48 pursuant to the terms of the Contract—they actually owed more than this sum but PNC ceased adding interest to the balance of the [Original] Loan.").[10] In any event, PNC has not put forward any showing that it was owed more than $775.48 prior to Mrs. Davis's November 2022 payment. As Mrs. Davis paid PNC exactly what it asserted it was entitled to under the Contract, PNC's breach of contract claim fails as a matter of law.[11] Accordingly, the Court DENIES PNC's motion for summary judgment on its breach of contract counterclaims and DISMISSES the claims against both Plaintiffs.

---

[10] Counsel for PNC confirmed this position at oral argument.

[11] To the extent PNC's request for declaratory relief is predicated on its fear that Mrs. Davis tendered the payment "under protest" to "preserve in Plaintiffs the right to recover the payment," (MSJ at 52), any declaratory relief this Court could provide appears to be moot in light of Plaintiffs' failure to amend their pleadings to seek restitution of the $775.48 payment, *see* Fed. R. Civ. P. 13. The Court further notes that, under the voluntary payment doctrine, it is unclear whether Plaintiffs could recover these funds. *See Brumagim v. Tillinghast*, 18 Cal. 265, 265–66 (1861).

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS, IN PART, and DENIES, IN PART, Defendant PNC's motion for summary judgment.

**IT IS SO ORDERED.**

DATED: March 25, 2024



HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE