James Ristvedt, AZ Bar #035938
*admitted pro hac vice*
E: jristvedt@consumerjustice.com
**CONSUMER JUSTICE LAW FIRM PLC**
8095 N. 85th Way
Scottsdale, AZ 85258
T: (480) 626-1956

Youssef Hammoud, CA #321934
E: yh@lawhammoud.com
**HAMMOUD LAW, P.C.**
3744 E. Chapman Ave, #F12269
Orange, CA 92859
T: (949) 301-9692

*Attorneys for Plaintiffs*
*Jessica Lee Davis and Corey Dell Davis*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JESSICA LEE DAVIS and COREY DELL DAVIS,<br><br>Plaintiff,<br><br>v.<br><br>TRANS UNION, LLC, EQUIFAX INFORMATION SERVICES, LLC, EXPERIAN INFORMATION SOLUTIONS, INC., and PNC BANK N.A.,<br><br>Defendants. | Case No.: 2:22-cv-05819-SPG-AS<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF** |

Plaintiff Jessica Lee Davis and Corey Dell Davis ("Plaintiffs"), by and through the undersigned counsel and pursuant to the Court's Scheduling Order [Dkt. No. 122], respectfully submit this Supplemental Brief. Plaintiffs also rely upon the arguments and authorities in the summary judgment briefing. [Dkt. No. 99], *et seq*.

1
PLAINTIFF'S SUPPLEMENTAL BRIEF

**A. Genuine issues of material of fact exist from which a reasonable jury can and will conclude that PNC's reporting was misleading.**

"An item on a consumer credit report can be inaccurate under the FCRA if it is either patently incorrect or materially misleading." *Carvalho v. Equifax Info. Servs.*, LLC, 629 F.3d 876, 890-91 (9th Cir. 2010). Even when information is technically accurate, it is still inaccurate within the context of the FCRA when it is "misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009) (quoting *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 150 (4th Cir. 2008)). Whether information is materially misleading is most commonly a question of fact to be decided by a jury. *Gorman*, 584 F.3d at 1163 (quoting *Saunders*, 526 F.3d at 150).

    *i. PNC's reporting created a false impression about the financial responsibility of Plaintiffs.*

The question of whether reporting is misleading is a factual issue for a jury to resolve, absent an extraordinary fact pattern. *See*, e.g., *Gorman*, 584 F.3d at 1163 (quoting *Saunders*, 526 F.3d at 150); *Valentine v. First Advantage Saferent, Inc.*, No. EDCV 08-142 VAP (OPx), 2009 U.S. Dist. LEXIS 110153, at *25-26 (C.D. Cal. Nov. 23, 2009); *Beseke v. Equifax Info. Servs. LLC*, 420 F. Supp. 3d 885, 892 (D. Minn. 2019).

Specific to the facts in this case, federal courts consistently hold that when information exists that provides context to derogatory credit reporting, the omission of that information with a furnisher's reporting creates a jury question as to whether that reporting is misleading. *See Saunders*, 526 F.3d 142 (holding that it was reasonable for a jury to conclude that a delinquency was misleading even though it was "technically accurate" because the furnisher's conduct – including communications that no balance was owed – excused the consumer's nonperformance); *Garcia v. Equifax Info. Servs., LLC*, No. 8:22-cv-1987-WFJ-UAM, 2024 U.S. Dist. LEXIS 71560 (M.D. Fla. Apr. 19, 2024) (holding that even

though it was technically correct to report that a bank had charged off a consumer's debt, because the bank omitted information that contextualized the charge-off, a jury question existed as to whether the bank's reporting was misleading); *Williams v. Experian Info. Sols., Inc.*, No. C22-5840 MJP, 2024 U.S. Dist. LEXIS 26852 (W.D. Wash. Feb. 15, 2024) (denying summary judgment and holding that a jury question existed when a furnisher omitted information that a consumer's ex-spouse had agreed to repay a loan and indemnify the consumer); *Curtis v. Trans Union, LLC*, 2002 U.S. Dist. LEXIS 23471, at *13 (N.D. Ill. Dec. 9, 2002) (holding that Trans Union's failure to "include[] information about [the plaintiffs'] pending state lawsuit" created a genuine issue of fact as to whether this omission was misleading); *Gunn v. JPMorgan Chase Bank, N.A.*, No. 8:24-53-AAQ, 2025 U.S. Dist. LEXIS 55707, at *4 (D. Md. Mar. 26, 2025) (holding that even though it was technically correct that a consumer's account had been charged off, the creditor's failure to report information about the consumer's payment plan was misleading).

There is no question that PNC's reporting was misleading. PNC's reporting communicated to the world that Plaintiffs were so financially irresponsible that PNC gave up on collecting the debt. *See Anderson v. Credit One Bank, N.A. (In re Anderson)*, 884 F.3d 382, 385 (2d Cir. 2018); *see also*, The Experian Team, Charged Off Debt Must Still Be Repaid (July 13, 2016) (https://www.experian.com/blogs/ask-experian/charged-off-debt-must-still-be-repaid/) ("A charged off or written off debt is a debt that has become seriously delinquent, and the lender has given up on being paid"). There are multiple reasons that this reporting was misleading.

First, the **undisputed** evidence demonstrates that Plaintiffs received several communications from PNC that communicated that the debt was satisfied:

- On November 23, 2021, PNC confirmed to Gravity Lending that the debt was paid and the loan was closed.[1] Joint Appendix of Facts ("JAF") at ¶

---

[1] To the extent that PNC trots out the now-tired "gap period" argument it has repeatedly made to handwave away the import of this call, Plaintiffs direct the Court to the previous briefing on this issue. [Dkt. No. 99-1 at 35-36]. As PNC knows, the November 2021 phone call occurred **after** the November gap period, an inescapable fact to which PNC has never so much as attempted to offer a response.

- 128.
- On December 14, 2021, PNC sent Plaintiffs a "GAP Refund" check, which – pursuant to the clear terms of the loan agreement – would have only been sent when all outstanding balances were paid. JAF at ¶¶ 26, 108.
- In early 2022, PNC confirmed to Plaintiffs directly that no outstanding balance was owed. JAF at ¶¶ 130, 134-136.

To be clear, regardless of PNC's explanation for **why** these communications occurred, the fact that these communications **did occur** is sufficient basis to establish a jury question on the issue of inaccuracy. These facts are strikingly similar to those in *Saunders*, where the Fourth Circuit held – in an opinion that the Ninth Circuit has relied upon extensively and repeatedly in cases such as this to form FCRA jurisprudence – that it was reasonable for a jury to conclude that the reporting of a delinquency, even though technically accurate, was misleading because the furnisher's conduct – including communications that no balance was owed – excused the consumer's nonperformance. *Saunders*, 526 F.3d at 151-152. Construing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that – like in *Saunders* – PNC's reporting was misleading because PNC's conduct excused the nonperformance of Plaintiffs.

Second, PNC's reporting omitted crucial context concerning its derogatory credit reporting about Plaintiffs. As has been discussed at length in this litigation, PNC's accounting practices and its communications to Plaintiffs are, at **bare minimum**, riddled with inconsistencies, unexplained information, and confusing, contradictory data. Similarly, there are disputed issues of fact concerning what PNC's predecessor-in-interest, BBVA, communicated to Plaintiffs' refinance lender, Gravity Lending. *See*, e.g., [Dkt. No. 99-1] at 32-35.

PNC's communications directly frustrated Plaintiffs' efforts to ascertain the basis and amount of debt owed. When Mrs. Davis contacted PNC numerous times in 2022, PNC consistently gave her different answers about what Plaintiffs owed and why. JAF at ¶ 134. Moreover, even the communications PNC claims support its argument contain a labyrinth of competing information, including a statement that

Plaintiffs were up to date on all payments, **which PNC admitted was confusing**. *See* [Dkt. No. 99-3] Joint Appendix of Evidence ("JAE"), Ex. 7.1 at 188:18-189:8 (testifying that PNC's account statements "[are] confusing, there's no doubt.").

There is no question that, but for PNC's shoddy accounting practices and communications, Plaintiffs could and would have paid the debt. Indeed, in October 2021 – the month in which PNC reported that Plaintiffs were unwilling or unable to pay approximately $650 – the undisputed record reflects that Plaintiffs paid more than $3,000 across their other active credit accounts. *See generally*, [Dkt. No. 97-1]. The record also reflects that the derogatory reporting from PNC was the **only** derogatory credit information reporting in Plaintiffs' credit reports. *Id*. Indeed, with the sole exception of PNC's reporting, Plaintiffs' credit reports reflected the truth about Plaintiffs which is that they are financially responsible, prudent people. *See*, e.g., JAE, Ex. 3.5 at 79:17-21 (emphasis added) ("[PNC] inaccurately portrayed us as people who did not pay their loan, and as was evidenced from my wife's very timely, prompt, payments. **That's who she is. She doesn't miss payments. She's not late on payments ever** […].").

Unfortunately, for reasons completely unrelated to Plaintiffs' financial responsibility, PNC reported to the world that Plaintiffs were deadbeats who either could or would not pay a meager $650 debt. This reporting omitted the crucial context about **why** this debt was unpaid – namely, the significant problems that were caused entirely by PNC and/or BBVA. As detailed thoroughly above, it is black letter law that when a furnisher omits information that would otherwise provide context to derogatory reporting, that omission creates a genuine dispute of material fact that must be resolved by a jury. Given the disputed issues of fact concerning the payoff amount, the constant and substantial problems caused by PNC and/or BBVA, and the total lack of any clarity with respect to what Plaintiffs actually owed and why for a substantial period of time, this context is not just helpful to a reader but **necessary** for any reader to understand the circumstances surrounding why Plaintiffs did not

remit payment until November 2022 when it was done in protest. JAF at ¶ 101.

Accordingly, genuine issues of material fact exist from which a reasonable jury can and will conclude that PNC's reporting was misleading because it presented a false impression about Plaintiffs' financial responsibility.

*ii.     PNC's reporting omitted information about Plaintiffs' disputes.*

Under the FCRA, furnishers have a duty to report "**potentially** meritorious or bona fide disputes that could materially affect how one interprets the consumer's creditworthiness." *Sherman v. Sheffield Fin., LLC*, 627 F. Supp. 3d 1000, 1012 (D. Minn. 2022) (emphasis added); *see also*, *Gorman*, 584 F.3d at 1163 ("It is the failure to report a bona fide dispute [...] that gives rise to a furnisher's liability under § 1681s-2(b)."). Importantly, the term "meritorious dispute" **does not mean** that a dispute is successful, would be successful at trial, or even that it is based on a legally sound defense. *See Sherman*, 627 F. Supp. 3d at 1013. Indeed, in *Sherman*, the District of Minnesota "synthesized *Gorman* and *Saunders* to find that a dispute is 'bona fide or potentially meritorious' when it (1) is relevant to the disputed credit line provided by the furnisher, (2) is generally factually correct and provides sufficient factual notice of the nature of the dispute, and (3) suggests that a borrower is less financially irresponsible than the undisputed report tends to suggest." *Barnes v. USAA F.S.B.*, No. 3:23-cv-51, 2024 U.S. Dist. LEXIS 93873, at *9 (W.D. Va. May 28, 2024).

Here, there is no doubt that Plaintiffs' disputes were relevant to the tradeline reported by PNC, since Plaintiffs disputed that specific tradeline and continued to disagree with PNC's findings in response to each dispute. Additionally, there is no doubt that Plaintiffs provided PNC **on multiple occasions** with information that was factually correct and which gave PNC ample, detailed notice of the basis for Plaintiffs' disputes. *See*, e.g., JAF at ¶¶ 44, 49, 64, 138, 142; *see also*, JAE, Ex. 4.2. Finally, Plaintiffs' disputes unquestionably suggest that Plaintiffs are less financially irresponsible than PNC's reporting suggested, because Plaintiffs' disputes evidence that the basis for any derogatory credit reporting was divorced from any financial

irresponsibility on the part of Plaintiffs. In short, Plaintiffs' disputes are the very definition of "meritorious disputes."[2]

Because Plaintiffs' disputes were meritorious, PNC was obligated under the FCRA to report the same. A furnisher can report precisely this information by using the Compliance Condition Code "XC[3]," which connotes "Completed investigation of FCRA dispute – consumer disagrees." JAE, Ex. 1.22 at 142. Instead, PNC reported the Compliance Condition Code "XH" in response to all of Plaintiffs' disputes, which connotes, "Account previously in dispute - investigation complete, reported by data furnisher." *Id*. at 143. The significance of the word "previously" is paramount here, because it **by definition** implies that Plaintiffs did not continue to dispute PNC's reporting. PNC knows to a certainty – by virtue of the continuous direct and indirect disputes it received, and by virtue of this lawsuit itself – that Plaintiffs continued to dispute PNC's reporting at all relevant times. Indeed, as laid out more fully in Plaintiffs' response to PNC's Motion for Summary Judgment, it was **precisely** this verbiage that the District of Colorado relied upon in holding that a furnisher's reporting of an "XH" code rather than "XC" was potentially misleading and therefore within the province of the jury. *See Gissler v. Pa. Higher Educ. Assistance Agency*, Civil Action No. 16-cv-01673-PAB-MJW, 2017 U.S. Dist. LEXIS 159796, at *15 (D. Colo. Sep. 28, 2017); *see also*, [Dkt. No. 99-1] at 44-45.

Accordingly, genuine issues of material fact exist from which a reasonable jury can and will conclude that PNC's reporting was misleading because it failed to report a bona fide or meritorious dispute.

**B.    Genuine issues of material of fact exist from which a reasonable jury can and will conclude that PNC's investigations were unreasonable.**

A furnisher has a duty to reasonably investigate when a consumer submits a

---

[2] Again, **even if PNC believes** that Plaintiffs' disputes were based on erroneous legal contentions, that belief does not, and cannot – as a matter of law – serve as the basis for refusing to report a meritorious dispute. *See Sherman*, 627 F. Supp. 3d at 1013.
[3] To the extent that PNC argues, as it did unsuccessfully before the Ninth Circuit, that the "XC" Compliance Condition Code applies only to "direct disputes" made to data furnishers, PNC **did in fact** receive at least one "direct dispute" from Plaintiffs. *See* JAE, Ex. 4.2.

dispute to a consumer reporting agency stating that reported information is inaccurate or incomplete. 15 U.S.C. § 1681s-2(b). As this Court has held, "[s]ummary judgment is generally an inappropriate way to decide questions of reasonableness because the jury's unique competence in applying the 'reasonable man' standard is thought ordinarily to preclude summary judgment. Thus, summary judgment on whether a furnisher conducted a reasonable investigation is appropriate when only one conclusion about the conduct's reasonableness is possible." *Miller v. Westlake Servs. LLC*, 637 F. Supp. 3d 836, 848 (C.D. Cal. 2022) (cleaned up). By definition, a reasonable investigation by a furnisher "requires some degree of careful inquiry." *Gorman*, 584 F.3d at 1155.

In this case, PNC's testimony about how it handled every single one of Plaintiffs' disputes was clear and unambiguous: 1) PNC received ACDVs; 2) PNC performed a data conformity review to confirm the data in the ACDVs matched the data in PNC's records; and 3) PNC verified the information that existed in its own records on the date of each ACDV response. JAE, Ex. 7.1 at 67:15-23. This kind of data conformity review has been considered the quintessential "unreasonable investigation" under the FCRA by federal courts throughout the United States. *See discussion in* [Dkt. No. 99-1] at 47.

Moreover, PNC could have easily uncovered the misleading nature of its own reporting had it investigated either the inconsistencies in its accounting, reviewed the myriad confusing and contradictory communications between PNC and Plaintiffs, or even reviewed its own records concerning those communications. Indeed, within the call log memorializing Mrs. Davis' many calls to PNC, one unnamed PNC employee stated that if PNC and/or BBVA were responsible for misquoting the payoff amount, PNC would "need to honor" the same. JAE, Ex. 7.7. PNC could have also uncovered the inaccuracy by looking beyond its own records to materials and sources of information that existed and that were reasonably available to PNC, like records from BBVA. Or, PNC could have contacted Gravity Lending directly to try to identify the

validity of Plaintiffs' disputes.

Had one of PNC's dispute investigators reviewed any of these records, the outcome may have been different. However, because PNC's procedures **require** an unreasonable and cursory data conformity review, no such "careful inquiry" ever took place. Based on this evidentiary record, PNC's investigations are very clearly unreasonable. However, at minimum, the record evidence in this case does not even come close to displacing the ordinary tenet that the reasonableness of a furnisher's investigation is a jury question. *Miller*, 637 F. Supp. 3d at 848.

Genuine issues of material fact exist from which a reasonable jury can and will conclude that PNC's investigations of Plaintiffs disputes were unreasonable.

### C. Genuine issues of material fact exist from which a jury can and will conclude that PNC's violations of the FCRA were willful.

In the context of the FCRA, "willful" violations include knowing, intentional, and/or reckless violations of statutory requirements. *Safeco Ins. Co of America v. Burr*, 551 U.S. 47, 59-60, 70 (2007). As this Court has correctly held, "Willfulness under the FCRA is generally a question of fact for the jury." *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007) (gathering cases from the Ninth Circuit). Further, courts can and do hold that when a party has repeatedly violated the FCRA, that repeated conduct is sufficient to support a jury finding of willfulness. *See Haberman v. PNC Mortg. Co.*, No. 4:11cv126, 2012 U.S. Dist. LEXIS 191086, *24-25 (E.D. Tex. Sep. 7, 2012) (holding, following a bench trial, that a furnisher's repeated violations showed that "these ongoing intrusions were intentional, or Defendant cared so little about the duties owed under the FCRA that such conduct was done with reckless disregard of Haberman's rights, giving rise to a willful violation of the statute.").

PNC's entire argument thus far concerning willfulness is based on its mere contention that PNC could not have willfully violated the FCRA without a "baseline negligent violation of the FCRA." [Dkt. No. 99-1] at 20. This contention has thus far been entirely predicated on PNC's erroneous belief that its reporting was accurate.

*Id*. As detailed herein, disputed issues of material fact exist concerning whether PNC's reporting was misleading.

Further, PNC cannot demonstrate the absence of a genuine issue of material fact as to whether its violations of the FCRA were willful. Both the Federal Rules and **controlling precedent** from the Supreme Court mandate that the **movant** bears the initial burden to demonstrate the absence of a genuine issue of material fact. *See* Fed. R. Civ. P. 56 (movant has burden to demonstrate absence of a genuine issue of material fact). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact). This is something PNC has not done – and cannot do – here since the entirety of its arguments concerning willfulness were predicated upon the incorrect premise that its reporting was "accurate."

Nevertheless, even if PNC made arguments concerning willfulness, such arguments would fail under these facts. The undisputed facts demonstrate that there are jury questions about whether PNC's reporting was misleading. The undisputed facts further demonstrate that PNC received numerous disputes – both directly and indirectly, and from both Mr. and Mrs. Davis – none of which resulted in either corrected reporting or a notation properly documenting Plaintiffs' continuing dispute of PNC's reporting. Consequently, this case falls within the vast majority of FCRA cases in which the question of willfulness is within the purview of the jury alone.

Accordingly, genuine issues of material fact exist from which a reasonable jury can and will conclude that PNC's violations of the FCRA were willful.

**D.     Conclusion**

As detailed herein, genuine issues of material fact exist concerning whether PNC's reporting was misleading, whether its investigations were unreasonable, and whether its violations of the FCRA were willful. Accordingly, Plaintiffs respectfully request the Court deny PNC's Motion for Summary Judgment in its entirety.

Dated: June 13, 2025

*/s/ James Ristvedt*
James Ristvedt, AZ Bar #035938
*admitted pro hac vice*
E: jristvedt@consumerjustice.com
**CONSUMER JUSTICE LAW FIRM PLC**
8095 N. 85th Way
Scottsdale, AZ 85258
T: (480) 626-1956
E: jristvedt@consumerjustice.com

Youssef Hammoud, CA #321934
**HAMMOUD LAW, P.C.**
3744 E. Chapman Avenue, #F12269
Orange, CA 92859
T: (949) 301-9692
E: yh@lawhammoud.com

*Attorneys for Plaintiffs*
*Jessica Lee Davis and Corey Dell Davis*

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2025, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter. Since none of the attorneys of record are non-ECF participants, hard copies of the foregoing have not been provided via personal delivery or by postal mail.

**CONSUMER JUSTICE LAW FIRM PLC**

By: */s/ Sierra M. Stewart*
Sierra M. Stewart